IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. AGUIRRE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DOMINIC G. AGUIRRE, APPELLANT.

Filed January 28, 2020.    No. A-19-208.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Carlos A. Monzón and David V. Chipman, of Monzón, Guerra & Associates, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Dominic G. Aguirre pled guilty to one count of first degree assault and one count of attempted kidnapping, each a Class II felony. The Lancaster County District Court sentenced him to 40 to 50 years' imprisonment for the assault, and 20 to 30 years' imprisonment for the attempted kidnapping; sentences to be served consecutively. Aguirre claims that there was an insufficient factual basis for his plea to attempted kidnapping, the district court imposed an excessive sentence, and his counsel was ineffective. We affirm.

BACKGROUND

On March 20, 2018, the State filed an information charging Aguirre as follows: Count 1, second degree murder, a Class IB felony, pursuant to Neb. Rev. Stat. § 28-304 (Reissue 2016); Count 2, kidnapping, a Class IA felony, pursuant to Neb. Rev. Stat. § 28-313 (Reissue 2016); Count 3, first degree assault, a Class II felony, pursuant to Neb. Rev. Stat. § 28-308 (Reissue 2016);

- 1 -

Count 5, second degree assault, a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-309 (Reissue 2016); and Counts 4 and 6, use of a firearm to commit a felony, each a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205 (Reissue 2016).

Pursuant to a plea agreement, the State agreed to amend the information in the current case and to dismiss a separate criminal case against Aguirre. The amended information filed on January 4, 2019, charged Aguirre with one count of first degree assault, a Class II felony, pursuant to § 28-308; and one count of attempted kidnapping, a Class II felony, pursuant to Neb. Rev. Stat. §§ 28-201 and 28-313 (Reissue 2016). At a hearing that same day, Aguirre pled guilty to both counts in the amended information. The factual basis provided by the State is as follows:

On July 10th of 2017 Lincoln police officers were in contact with Antonio Madlock, who reported that his brother, Phillip Madlock [(Madlock)], was missing. Antonio told the officers that he had not heard from Phillip for two weeks, which was unusual. Additional family members also reported having no contact from Phillip Madlock during that time, and . . . the mother of Phillip Madlock's child[] told officers the last time she had spoken with Phillip Madlock was June 28th of 2017.

Through the course of the investigation, a number of people provided information regarding the case. Tim Montgomery advised Lincoln police investigators that Phillip Madlock had contacted him, asking for some help in finding some marijuana. Mr. Montgomery stated that he made some calls . . . . Montgomery was aware that Paul Clark had a farm in California on which he raised marijuana, which Mr. Clark had transported back . . . for sale. Mr. Clark indicated he could help out Tim Montgomery by providing some marijuana.

. . . [O]n June 28th of 2017 Phillip Madlock came to Tim Montgomery's home . . . in Lincoln, Lancaster County, Nebraska so he could get the marijuana.

Once there, Paul Clark arrived with Dominic Aguirre . . . . Mr. Montgomery allowed both men to enter into his home, but when Mr. Montgomery started to introduce Paul Clark to Phillip Madlock, Montgomery said Mr. Clark immediately began confronting Phillip Madlock about money Mr. Clark said was owed to him by Phillip Madlock.

Montgomery said . . . that Madlock and Clark engaged in a heated argument that Dominic Aguirre also joined in, all of them arguing about money that Mr. Clark and Mr. Aguirre claimed Mr. Madlock owed to them for a prior unpaid amount of marijuana.

According to Mr. Montgomery, the arguing became more intense . . . until Dominic Aguirre punched Phillip Madlock in the face with his fist, busting Madlock's lip open. Mr. Montgomery said that Mr. Aguirre then began punching Madlock a number of times until Montgomery pushed Aguirre away from Madlock . . . .

Mr. Montgomery said that Mr. Aguirre then produced a handgun that he threatened Mr. Montgomery with for interfering, at which time Mr. Montgomery then jumped behind Paul Clark and implored Mr. Clark to stop Mr. Aguirre and for both of them to leave his home.

Phillip Madlock joined in, begging Mr. Clark to stop Mr. Aguirre and for them to leave the house. Instead Paul Clark continued to demand Madlock give him and Mr. Aguirre their money. Mr. Aguirre also continued to demand money from Mr. Madlock and

began hitting Madlock in the head, opening a cut over Madlock's eye and sending him off balance.

Mr. Montgomery said Dominic Aguirre continued to hit Madlock, who began bleeding even more profusely. At this point Mr. Montgomery noticed that Paul Clark also had a handgun and he saw Mr. Clark also punch Phillip Madlock . . . .

Despite continued pleas from . . . Montgomery for Mr. Clark and Mr. Aguirre to leave his home, Mr. Clark responded that they were not going anywhere until they got their money.

. . . At some point Mr. Madlock moved from the residence into the attached garage followed by Dominic Aguirre, who Mr. Montgomery said again struck Mr. Madlock, knocking him to the ground.

Mr. Montgomery said that based on his observations of Phillip Madlock . . . Montgomery believed Phillip Madlock was suffering injuries so severe that he needed to be transported to the hospital.

Mr. Montgomery continued to ask Paul Clark to leave with Dominic Aguirre, complaining about the blood and disruption to his house. Mr. Clark indicated he would get it cleaned up and then used his cell phone, after which Merrie Whitaker and Anthony Brock arrived at the . . . residence.

Merrie Whitaker told investigators that she arrived at [Montgomery's residence] on June 28th after being called by Paul Clark, who said he had a house he wanted her to clean. As Ms. Whitaker had done cleaning jobs in other houses that Mr. Clark had remodeled and sold, she went to [Montgomery's residence], expecting the same type of situation. However, when she arrived she saw Dominic Aguirre outside the residence, and when she went inside from the kitchen, she saw a man lying on his back on the floor of the garage, moaning. And she also overheard Paul Clark talking with another male, who was telling Mr. Clark, "I think you broke his jaw."

Anthony Brock stated that he received a Snapchat of a man getting beat up. After receiving a second similar Snapchat -- and this was the same date, June 28th of 2017, in the second Snapchat he recognized Dominic Aguirre. Mr. Brock then received directions to [Montgomery's residence]. Mr. Brock was aware that Phillip Madlock owed money to Dominic Aguirre for a front of marijuana that Mr. Madlock had not repaid and . . . that Mr. Aguirre had been looking for Mr. Madlock because he wanted his money.

When Mr. Brock arrived at [Montgomery's residence], he saw a bloody Philip Madlock lying on a sheet on the floor of the garage, mumbling incoherently. Mr. Brock said it was apparent that Phillip Madlock needed serious medical attention. Instead Brock said Phillip Madlock was carried out of the garage and placed into the back seat of Madlock's Chevy Avalanche.

Mr. Brock was told that there was a man who knew where Phillip Madlock's money was and that Madlock was going to be taken there so that Clark and Aguirre could get money from the man.

Dominic Aguirre drove away in the Avalanche with Phillip Madlock, who was still alive, followed by Paul Clark driving his vehicle with Anthony Brock following Clark.

The three stopped at a business off Cornhusker Highway in Lincoln, Lancaster County, Nebraska. Clark and Brock went into the business, and when they came out, Anthony Brock said he saw Madlock's Avalanche moving from side to side and there were only two people in the vehicle, Mr. Madlock and Mr. Aguirre.

Soon after that, it was discovered Mr. Madlock was dead. Mr. Brock said that Dominic Aguirre had said that Phillip Madlock had choked on his own blood. When it was discovered that Mr. Madlock was dead, the body was transported outside Lancaster County, where it was disposed of.

After the State presented the factual basis, the district court asked Aguirre's counsel if he had any dispute with or comment to the facts recited by the State. Counsel responded, "Your Honor, it's the defense's position that the State has sufficiently established a factual basis for the plea. To the extent that we have disagreements with the facts -- and we do, we will reserve those for the sentencing hearing." The court then asked Aguirre if he accepted the factual basis as true, and after an off-the-record conversation with his counsel, Aguirre responded, "Just as my attorney has said that we will say our side at sentencing, Your Honor." The district court then informed Aguirre that "for the purposes of this case your plea must be based on some facts," and the court asked Aguirre if it could use the facts given by the State to support his plea. Aguirre responded, "For today's purposes, yes, Your Honor." The district court found there was a sufficient factual basis to support the plea, accepted Aguirre's guilty pleas to each count, and found him guilty of the same. The case was set for sentencing.

After a hearing on February 13, 2019, the district court sentenced Aguirre to 40 to 50 years' imprisonment for the assault (with 397 days of credit for time served), and 20 to 30 years' imprisonment for the attempted kidnapping; sentences to be served consecutively.

Aguirre appeals.

ASSIGNMENTS OF ERROR

Aguirre assigns, reordered, (1) the district court erred in finding there was a sufficient factual basis to accept his guilty plea to attempted kidnapping, (2) the district court imposed an excessive sentence, and (3) his counsel was ineffective.

In *State v. Mrza*, 302 Neb. 931, 935, 926 N.W.2d 79, 86 (2019), the Nebraska Supreme Court stated, "We now hold that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity." See, also, *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court). Because Aguirre's appellate brief was filed 2 months post-*Mrza* and counsel's deficient performance was not alleged with specificity in the assignment of errors section of his brief, Aguirre's ineffective assistance of counsel claim will not be addressed.

- 4 -

## STANDARD OF REVIEW

A trial court is afforded discretion in deciding whether to accept guilty pleas, and an appellate court will reverse the trial court's determination only in the case of an abuse of discretion. *State v. Ettleman*, 303 Neb. 581, 930 N.W.2d 538 (2019).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Ettleman, supra.*

## ANALYSIS

### SUFFICIENCY OF FACTUAL BASIS

Aguirre claims that there was not a sufficient factual basis for the district court to accept his guilty plea to attempted kidnapping.

Section 28-313 provides:

(1) A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to do the following:

(a) Hold him for ransom or reward; or

(b) Use him as a shield or hostage; or

(c) Terrorize him or a third person; or

(d) Commit a felony; or

(e) Interfere with the performance of any government or political function.

Neb. Rev. Stat. § 28-312 (Reissue 2016) provides:

As used in sections 28-312 to 28-315, unless the context otherwise requires:

(1) Restrain shall mean to restrict a person's movement in such a manner as to interfere substantially with his liberty:

(a) By means of force, threat, or deception; or

(b) . . . and

(2) Abduct shall mean to restrain a person with intent to prevent his liberation by:

(a) Secreting or holding him in a place where he is not likely to be found; or

(b) Endangering or threatening to endanger the safety of any human being.

And § 28-201 provides:

(1) A person shall be guilty of an attempt to commit a crime if he or she:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he or she believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime.

(2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to

establish liability with respect to the attendant circumstances specified in the definition of the crime, he or she intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

Aguirre argues that although the prosecutor stated that Phillip Madlock (Madlock) was carried into his vehicle, with Aguirre driving said vehicle, "[t]here is no allegation that [Aguirre] ever carried Madlock to the vehicle" and "[t]here was no evidence that Madlock was forced to go into the vehicle against his will." Brief for appellant at 24. "There is a complete voidance on the record by the prosecutor's statement at the plea hearing that would indicate that [Aguirre] even tried to abduct Madlock," "[a]nd in fact, the prosecutor states that Brock says Madlock was carried to the vehicle, when in fact the PSI clearly indicated that Brock never saw Madlock enter the vehicle." Id. (Emphasis in original.) Thus, Aguirre argues there was an insufficient factual basis to demonstrate that Aguirre committed the offense of attempted kidnapping.

The State contends, "contrary to Aguirre's assertion, the record does, in fact, contain evidence showing Madlock did not voluntarily accompany Aguirre to his truck." Brief for appellee at 13. The State, citing to the presentence report (PSR), states that "[d]uring a deposition on June 27, 2018, Anthony Brock testified that Montgomery and Aguirre carried Madlock to his truck and placed him in the back seat." Id. And that "during a proffer interview on June 29, 2018, . . . Aguirre's former roommate[] advised the police that Aguirre had told her that 'Madlock was alive when they put him in his truck.'" Id. The State contends that the factual basis was supported by the record and sufficient to support Aguirre's plea to attempted kidnapping.

A factual basis may be determined from inquiry of the defendant or county attorney, or by examination of the presentence investigation. State v. Richter, 220 Neb. 551, 371 N.W.2d 125 (1985). See, also, State v. Tweedy, 209 Neb. 649, 309 N.W.2d 94 (1981) (preferred procedure for ascertaining whether or not factual basis exists to support guilty plea is to inquire directly of defendant, but examination before sentencing of presentence report containing such facts is acceptable alternative).

According to the factual basis provided by the State at the plea hearing, after suffering severe injuries at the hands of Aguirre, Madlock was carried out of the garage and placed into the back seat of Madlock's Chevy Avalanche. Brock was told that there was a man who knew where Madlock's money was and that Madlock was going to be taken there so that Clark and Aguirre could get money from the man. Aguirre drove away in the Avalanche with Madlock.

Additional information is found in the PSR, and we recount the relevant information here.

According to a police report dated January 19, 2018, a confidential source reported that Aguirre was upset with Madlock because Madlock stole a large amount of marijuana from Aguirre. On June 28, 2017, Aguirre and Clark went to Montgomery's residence and severely assaulted Madlock. Madlock, "barely alive," was dragged to the garage. He was then forced into the back of his own vehicle in an effort to take him to get some of the money owed. Aguirre drove Madlock's vehicle.

In an interview with law enforcement on January 24, 2018, Montgomery stated that both Aguirre and Clark had guns at the time of the incident. After Aguirre severely beat Madlock, they

moved into the garage where Montgomery begged Clark to let him take Madlock (who was seriously injured) to the hospital, and Montgomery even offered to pay some of Madlock's debt or to sell drugs for Clark and Aguirre. Aguirre hit Madlock again while in the garage. Madlock said that "Chris" had some of his money, and Madlock and Aguirre were planning on going to "Chris" to get the money. Madlock was forced into his own truck. When asked by the investigator how Madlock got into his own truck, Montgomery said Madlock was able to walk, but he had no choice. Then Aguirre drove away with Madlock as a passenger.

In an interview with law enforcement on January 31, 2018, Whitaker stated that she was called to Montgomery's house to clean. While there, she heard Aguirre and Clark talking about putting Madlock in the car and leaving.

In a proffer interview conducted on June 29, 2018, Nicole Wehland (who was dating Aguirre) stated that at the end of June 2017, Madlock's vehicle pulled up in the alley by her residence (where she lived with Aguirre). Aguirre told Wehland that Madlock was dead in the back of the vehicle. He went on to explain Madlock was alive when they put him in his truck, but later Madlock woke up and tried to fight back. Wehland said Aguirre told her he either had to knock Madlock out or put him out; then Madlock started choking. Aguirre's rationale was, "'As far as I'm concerned, he choked on his own blood.'"

In a deposition taken on June 27, 2018, Brock stated that Montgomery and Aguirre "carried" Madlock and put him in the backseat of his own vehicle. When asked if he saw Montgomery and Aguirre put Madlock in the backseat, Brock responded, "Yeah." He stated that Aguirre and Madlock left in Madlock's vehicle. However, we note that in a previous statement to law enforcement on February 7, 2018, Brock acknowledged that he did not see Madlock being put in the vehicle.

Based on the information given by the State at the plea hearing, and the additional information found in the PSR, there was sufficient evidence to show that Madlock did not voluntarily accompany Aguirre into the vehicle. Madlock was severely beaten by Aguirre (who had a gun), and was then forced to get into his own vehicle and was driven away by Aguirre. Accordingly, we find that there was a sufficient factual basis for the district court to accept Aguirre's guilty plea to attempted kidnapping, and the district court did not abuse its discretion by accepting his plea.

EXCESSIVE SENTENCE

Aguirre claims his sentences are excessive. He was convicted of one count of first degree assault and one count of attempted kidnapping, each a Class II felony. A Class II felony is punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105(1) (Reissue 2016). Aguirre was sentenced to 40 to 50 years' imprisonment for the assault and 20 to 30 years' imprisonment for the attempted kidnapping; sentences to be served consecutively. His sentences were within the statutory range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's

(1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Aguirre was 37 years old at the time of sentencing. According to the PSR, he was single and had four children from prior relationships with two different women. He had obtained his diploma through the GED program and attended community college, but did not complete a degree. Aguirre was incarcerated at the time of the PSR, but reported that prior to his incarceration he had been out of work for most of 2017, but was working on a home owned by him and his mother. He also worked in the past with his brother-in-law flipping houses, and admitted being involved in the sale/delivery of marijuana with his brother-in-law (Paul Clark).

Aguirre's criminal history dates back to 1996 when he was a juvenile. His adult criminal history includes convictions for driving under the influence in 1999 (fine, 7 days' jail, license suspension); "refuse to comply" with order of police officer, disturbing the peace, "make false statement" to police officer (twice), and "Fail to Appear" (four times) in 2000 (fines); operating a motor vehicle while suspended in 2000 (fine, 30 days' jail, license suspension); driving under the influence/.08, Second Offense, in 2002 (fine, 30 days' jail, license suspension); "Suspended/Revoked, Not Eligible" in 2002 (7 days' jail, 18 months' probation); "Refuse to Submit to Test w/2 Prior Convictions" and "DUI-3rd Offense" in 2007 (fines, 60 and 90 days' jail time, license revocation); driving during revocation in 2012 (180 days' jail, license revocation); criminal attempt of a Class I misdemeanor in 2012 (amended from attempted theft by shoplifting $200-$500, fine); disturbing the peace and "fail to appear" in 2012 (fines); "obstruct a peace officer" in 2012 (7 days' jail); domestic assault-3rd degree in 2014 (18 months' probation; probation later extended 3 months); criminal attempt of a Class IV felony in 2014 (amended from "possess controlled substance," fine). He has also been fined for various traffic offenses. A separate 2018 criminal case charging Aguirre with "Conspiracy to Deliver Or with Intent to Deliver a Controlled Substance, Schedule 1, 2, 3," a Class IIA felony, was dismissed as part of the plea agreement in the current case.

Aguirre's current convictions were for the amended charges of the first degree assault on and attempted kidnapping of Madlock. According to the probation officer's report, Aguirre believed Madlock's death was senseless and he expressed remorse. "[Aguirre] stated that he knows he needs to be held accountable and be punished for his actions." "He noted that he should have taken [Madlock] to the hospital and not gone along with [Clark]. He said he tried to resuscitate [Madlock], but it was too late."

The probation officer conducted a level of service/case management index. Aguirre was assessed as an overall "very high" risk to reoffend. He scored "[v]ery [h]igh" in the criminogenic risk factor domains for alcohol/drug problem and antisocial pattern. He scored "[h]igh" risk in the domains for criminal history, education/employment, leisure/recreation, and companions. And he scored "[m]edium" risk in the domains for family/marital and procriminal attitude/orientation.

At the sentencing hearing, Aguirre's counsel argued that additional information, "mostly from Mr. Aguirre himself," showed that other people (Montgomery and Brock) were "under the

influence" of Clark and they minimized their own behaviors and "embellished" that of Aguirre "because they were scared" of Clark. However, counsel stated, "I'm not arguing legal culpability here, Judge," "I'm not arguing that the crimes that [Aguirre's] been convicted of weren't in fact committed," "my argument is more technical." Counsel argued Aguirre should be "look[ed] at" differently than Clark at sentencing; Clark had already been sentenced. For example, counsel stated Clark knew that Madlock was at that house but Aguirre did not, "so the motivation" for going to the house was different; Clark was "motivated by money and a threat to his drug trafficking enterprise," but Aguirre was "just following" Clark into the home. Additionally, Clark did not "own up" to his wrongdoing, whereas Aguirre knew he did something wrong.

Aguirre's counsel stated Aguirre had the "capacity to change." He had earned certificates for biblical and parenting classes taken postarrest in pretrial detention, and he has a support system. Counsel stated, "[W]e have a situation that I don't believe is a circumstance likely to even recur." "This is a crime that was brought out by a drug enterprise that was conducted by another person by a set of circumstances bringing people together that he didn't ever try to do, but it happened."

Aguirre spoke on his own behalf, stating, "I sympathize with the family," "I can't imagine what they're going through," and "I understand my actions completely have devastated them." Aguirre stated he "never had an intention to take that man's life," but knows his actions had a part in that. Aguirre "wish[ed] [he] would have made better decisions that day." He said he "wasn't living a good life," "was obviously selling drugs," and "was trying to get clean and sober" as he had "been battling with addiction." Aguirre stated he "was with [Madlock] in that vehicle," but that Madlock was "never assaulted . . . after we left [Montgomery's home]." "Madlock fell asleep in the back of the vehicle" when they left, and later Aguirre "realized that [Madlock] wasn't breathing." Aguirre stated he tried to resuscitate Madlock; "I kick myself daily for not making a decision to . . . take him to the hospital."

That State argued that defense counsel "gave quite an eloquent speech about how Mr. Aguirre is different from Mr. Clark and the things that happened," but "that statement is based on what Mr. Aguirre claimed happened" and "that is not the same as what the other witnesses have said and it does not accurately reflect Mr. Aguirre's participation in this crime." "Aguirre not only was involved in beating Mr. Madlock," but according to the other witnesses and Clark, "there were two guns, and according to Mr. Clark[,] Mr. Aguirre was the one who had both of them and Mr. Aguirre was the one who pulled one of the guns, held it to Mr. Madlock's head and wanted Paul Clark to take a picture and send it." "When you look at the different information that's part of the [PSR], what is quite clear is that Mr. Clark and Mr. Aguirre are two men who are desperately pointing the finger at each other in an attempt to avoid punishment." According to the State, Clark received 40 to 50 years' imprisonment for first degree assault and 20 to 30 years' imprisonment "consecutive" for use of a weapon.

The State recounted Aguirre's criminal history and his assessment as a "very high risk" to reoffend." The State noted that Aguirre "received a very beneficial plea agreement" and asked that the sentences for the two convicted counts run consecutive.

The district court stated that it had reviewed the PSR and the additions thereto, and that it had considered the relevant sentencing factors. It also noted that the nature of each offense "was disturbingly violent, brutal and callous." The court sentenced Aguirre to 40 to 50 years'

imprisonment for the assault and 20 to 30 years' imprisonment for the attempted kidnapping; sentences to be served consecutively.

In his brief, Aguirre argues that the excessiveness of his sentence "is demonstrated by the trial court giving both [him] and his co-defendant the exact same sentence, despite the fact Paul Clark was the leader of this drug trafficking and [Aguirre] was his minion." Brief for appellant at 3-4. In response, the State argues that "it is apparent from the materials in the PSR that Aguirre inflicted most of Madlock's injuries and was primarily, if not solely, responsible for Madlock's death." Brief for appellee at 15. Aguirre also likens his actions with that of voluntary manslaughter "due to the sudden quarrel that [he] found himself in with Madlock" and notes that voluntary manslaughter is only punishable by up to 20 years in prison. Brief for appellant at 20. Despite his argument, Aguirre was not convicted of voluntary manslaughter, he was convicted of first degree assault, which was punishable by 1 to 50 years' imprisonment. Additionally, he argues that the evidence did not demonstrate that Aguirre ever attempted to kidnap Madlock. However, we have already determined that there was a sufficient factual basis for the attempted kidnapping plea.

Having considered the relevant factors in this case, we find that Aguirre's sentences were not excessive or an abuse of discretion and his sentences are therefore affirmed. See, *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court; it is within trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively); *State v. Meehan*, 7 Neb. App. 639, 585 N.W.2d 459 (1998) (sentencing court has broad discretion in source and type of evidence it may use in determining kind and extent of punishment to be imposed within limits fixed by statute; sentencing court in noncapital cases may consider defendant's nonadjudicated misconduct in determining appropriate sentence).

## CONCLUSION

For the reasons stated above, we affirm Aguirre's convictions and sentences.

AFFIRMED.